IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
South Bend Division

JOSHUA BELK,

       Plaintiff,

3:07CV0203 WL

CASE NO. _____

   v.

MILLERS MUTUAL GROUP OF INSURANCE COS.,
EQUITY MUTUAL INSURANCE COMPANY,
GEORGE C. ROGGE AGENCY, INC.,
GEORGE A. ROGGE, and LAWRENCE ("LARRY")
OLIN,

       Defendants.

## COMPLAINT

1.  Plaintiff JOSHUA BELK ("Belk"), Pro Se, complains of Defendants MILLERS MUTUAL GROUP OF INSURANCE COS. ("Millers"): EQUITY MUTUAL INSURANCE COMPANY ("Equity"); GEORGE C. ROGGE AGENCY, INC. ("Rogge Agency" or "Agency"); GEORGE A. ROGGE ("Rogge"), and LAWRENCE "LARRY" OLIN ("Olin"), and alleges as follows:

### I. PARTIES

2.  Plaintiff Joshua Belk is a resident of St. John, Indiana.

3.  Defendant Millers Mutual Group of Insurance Cos. has its principal office in Harrisburg, Pennsylvania.

4.  Defendant Equity Mutual Insurance Company has its principal place of business in London, England and has its main United States offices in Des Moines, Iowa.

5.  Defendant George C. Rogge Agency, Inc. has offices in Merrillville and Gary, Indiana.

-1-

6.   Defendant George A. Rogge is a resident of Merrillville, Indiana, and he also has a home in Gary, Indiana.

7.   Defendant Larry Olin had offices at 1711 West Ridge Road, Gary, Indiana 46408.

## II. INTRODUCTION

8.   This Complaint alleges that Millers, Equity, the Rogge Agency, Rogge and Larry Olin, engaged in common law fraud/fraudulent misrepresentation with regard to Belk's work at the Agency, and more particularly  to Belk's supposed misappropriation of the Agency's funds.   In reality, Millers, Equity, Rogge and Olin colluded in concealing Rogge's criminal misuse of the Agency's Premium Fund Trust Account ("PFTA") by accusing Belk of stealing funds from the Agency in order to pay his personal credit card bills at MBNA.  This fraudulent action by the Defendants led to Belk's conviction on eight counts of mail fraud in the United States District Court for the Northern District of Indiana.

## III. JURISDICTION AND VENUE

9.   This Court has federal question jurisdiction over this matter pursuant to 28 USC §1331 because the Complaint is brought in this Court where one four of the parties: Joshua Belk, George Rogge Agency, Inc. George A. Rogge, and Larry Olin are residents of the Northern District of Indiana.

10.  This Court has supplemental jurisdiction under 28 USC §1347, over any state law statutory and common law claims alleged.

11.  Venue is proper in the federal district court for the

Northern District of Indiana because the Plaintiff, and Defendants Rogge, the Rogge Agency and Olin reside in the District.  Also, both Millers and Equity do substantial business in the  Northern District of Indiana.

## IV.  FACTS

12.  The George C. Rogge Agency has been in business in Lake County, Indiana since the 1920s.  Few residents of Northwest Indiana are unfamiliar with this Agency.  In April 1996, Rogge, grandson of the firm's founder, hired Belk as a bookkeeper and computer person. Belk soon was promoted to Chief Financial Officer in charge of preparing payroll, handling bank deposits and disbursements to vendors through either a computer payment program or use of a bank stamp.  Belk did not have authority to access funds from the PFTA.  Additionally, all payments, including payroll and commissions were approved by Rogge prior to payment.  No one could make a significant decision without him being consulted.  There is no question that Rogge abused his position of trust in a way that facilitated the commission and concealment of his offense.  Every step that Rogge completed was either necessary to set the scheme in action or to raise the subsequent complaint to the federal authorities and the prosecution of Belk was critical to this scheme.

13.  The Rogge Agency operated the Classic Auto Program initially for the Illinois Founders Insurance Companies, then the Miller Group of Insurance Companies, and later, Equity Mutual Insurance Company. Rogge was responsible for supervising agents, underwriting applications,

collecting and remitting premiums to these carriers.  The only portion of the insurance process that Rogge did not administer was claims management and payment of those claims.  Rogge was the sole signatory on the PFTA.

14.  Larry Olin, dba Classic Auto Insurance of Gary and Michigan City, also known as Steel City Auto Insurance was a sub agent to Rogge. Mr. Olin's primary carrier was the Classic Auto Insurance Program. Olin's agencies were primarily cash based and at first he submitted client payments in cash.  Usually, Rogge would personally pick-up the payments in cash from Mr. Olin.  Soon Olin began submitting payments to Rogge by a company check instead of cash, and invariably these checks bounced.

15.  Olin was keeping the cash payments made to him by his customers and sending in worthless checks in their stead.  Beginning in 1998 and continuing through 2002, Olin submitted almost $700,000 in checks to the Rogge Agency for clients.  Rogge continued taking the checks and passed through the applications because the more insurance written by Rogge's Agency, the greater the General Agent's override in commissions from the Miller Group and other companies Rogge repre-sented.

16.  Miller and Equity Insurance were naturally interested in accepting the insurance applications so as to increase their insurance policies in force.

17.  Yet, each insufficient funds check written by Olin left a deficit in the PFTA.  As the Olin deficit grew, it became impossible for Rogge to keep from reaching the point where neither Olin nor

Rogge were able to keep up with the shortage.  They had run up the scheme to well over $477,000.

18.   But, Olin Insurance and related companies were Rogge's largest insurance producers in the Classic Auto Program, and therefore, losing the Gary Agency would produce a serious strain between Rogge and the various companies he represented.  In order to stay in business and disguise the "Ponzi" scheme he was perpetrating, Rogge needed a scapegoat to bring the Government.  He then claimed the Agency's prior performance and PFTA deficit was due to Belk's alleged embezzlement.

19.   The reasons Rogge attempted to conceal his PFTA embezzlement is obvious.  Pursuant to the Insurance Code, there are five specific types of withdrawals of funds which are permitted from the PFTA.  These permissible withdrawals are:

(1)  Net or gross premium remittances  due other licensees or insurers.  Claims payments or reinsurance premium when offset at the direction of the insurer may be transferred to another account;

(2)  Return premiums due insureds;

(3)  Commissions due the licensee, net of any financial institution fees or service charges, or commissions due another licensee only when the commission withdrawal is matched and identified with premiums previously deposited into the PFTA;

(4)  Non-premium monies when matched and identified with prior non-premium PFTA deposits;

(5)  Interest or other revenue which the licensee is authorized to retain.

20. Rogge kept complete control over the PFTA. He knew that
he was not in compliance since the Code further stated that firms
with PFTAs must maintain books and records which reflect all insurance
transactions, specifically with regard to premiums and other monies
received and deposited into the PFTA, and lawfully withdrawn from the
PFTA. Failure to do so is deemed evidence of untrustworthiness,
incompetence, and financial irresponsibility. The Code further requires
that licensees prepare and maintain monthly financial institution
account reconciliations of the PFTA, and that licensees must maintain
positive running balances in the PFTA. Belk had consistently informed
Rogge of the negative balances in the PFTA. Rogge was willfully in
disregard of his duty to ensure that he operated lawfully and that
money was not taken from the account.

21. Each year, Rogge was required by law to apply for his
insurance producers license, a license that was required for him and
his company to stay in business, the only way he could keep control
over the premium cash flow that he was required to hold in trust and
the only way he could hope to keep information about his illegal use of
trust money from coming out. Each year, the Indiana Department of
Insurance mailed a new application for him to fill out to apply for
the renewal of his license, and each year Rogge signed a promise on
his renewal application that he was the person responsible for Rogge
Insurance Agency, and that he would maintain the premiums in trust as
required by Indiana law. The license enabled Rogge to continue using
the funds that simply did not belong to him, but was possessed by

-6-

him for the benefit of others in trust.   Instead, Rogge used these funds for his own use, benefit, and growth.   Rogge remained free from the scrutiny of the Department of Insurance due in part to his false assurances to the Department that he was following the law.

22.   As Belk became more aware of the day to day workings of the Agency, Belk became aware of Rogge's treatment of Olin's insufficient funds checks.   Each time Olin's check bounced, Belk would inform Rogge of the need for cash to cover operating expenses, and Rogge would transfer money from the PFTA to the operating account further depleting the PFTA.   Also during this time, Belk learned that the Rogge Agency was constantly in a low cash position.   The cash position of the Rogge Agency began to deteriorate because of Rogge's transfers to cover the Olin overdrafts.

23.   Belk continuously provided trust calculations and monthly financial statements to Rogge that showed the company was continuing out of trust.   Belk advised Rogge repeatedly tht the company was out of trust due to the financing of Olin's agencies.

24.   By 2002, Rogge knew that the deficit was so great that his long-term criminal conduct was going to be exposed and, therefore Rogge had to come up with a plan to conceal this fraud.

25.   Based on the above facts, it is now apparent that Rogge lied on the witness stand in Belk's criminal trial.   Rogge lied when he said that Belk did not have a bonus compensation agreement with him for employment as a Chief Financial Officer of the Agency.   Rogge lied when he stated that Belk wrongfully took money from the Rogge Agency operating account for personal needs without a bonus compensa-

tion agreement.  Rogge lied when he stated that the Rogge Agency's poor performance was due to Belk's alleged embezzlement.  Actually, it was due to Rogge's looting of the Agency's PFTA to subsidize the Olin Agencies.

26.  Belk did not have a written employment agreement with the Rogge Agency.  This can be attributed to a combination of Belk's youth and trusting nature.  At the beginning of the bonus arrangement, in November 1997, Rogge prepared a written statement to Ennis Mortgage of Hammond, Indiana where Belk was applying for a home mortgage. In the statement, Rogge informed Ennis that Belk's compensation was comprised of a $30,000 per year salary together with bonuses such as a concurrent $5,000 bonus check Belk received from Rogge.  Although this information was not presented at Belk's trial, it is in the possession of his former trial counsel, Nicholas Thiros of Cohen & Thiros, 200 East 90th Drive, Merrillville, Indiana 46410-7089. This bonus plan was tied to Belk's performance in the operations department of the Rogge Agency, i.e. cost-cutting, underwriting expenses, etc., not marketing and sales.  The total bonus plan tracked at roughly $5,000-$7,000 per month.

27. Rogge's lies in Belk's criminal case concerning among other facts, the bonus plan, were sufficiently "material" to support a perjury conviction had the government not been so blinded by Rogge's prevarications.

28.  Rogge's testimony, and his lies, were not collateral to the factual dspute in Belk's criminal case.  The entire government case against Belk rested on the premise that Belk had bilked Rogge

Rogge out of money and that alleged theft was the reason that the
Agency was near insolvency.  Rogge's false testimony was the corner-
stone of the government's case against Belk.  Without Rogge's
perjured testimony, the government's evidence was legally insufficient
to establish the requisite mens rea element of mail fraud to convict
Belk.

29.  Rogge acted with malice and with intent to defraud Belk
to have him prosecuted for a crime that Rogge had, in fact, committed,
in order to conceal Rogge's fraudulent actions.

30.  Until recently, Belk was unaware that Rogge had been
pilfering the PFTA with the acquiescence of the Millers Group and
then Equity Mutual.  Rogge had diverted most of the $678,306.65 from
the PFTA from some time prior to 1998 through 2002.  Millers and
Equity were responsible to Rogge's customers for the premiums that he
or sub-agents collected from customers.  Therefore, if Olin took a
payment in case, split the money with Rogge or someone else, submitted
an insufficient funds check to the Agency's PFTA, then the carrier
stands responsible to the customer for the theft of premium.

31.  Under the Financial Responsibilities section of the Insurance
Code it states:

> Any money that an insurance producer, limited line producer,
> temporary insurance producer, business entity, or surplus
> line producer receives for soliciting, negotiating, effect-
> ing procuring, renewing, continuing, or binding policies of
> insurance shall be held in a fiduciary capacity and shall
> not be misappropriated, converted, or improperly withheld.
> ......
> An insurer that issues a policy of insurance shall be deemed
> to have received payment of the premium if the insured paid
> any insurance producer requesting the coverage.  The insurer
> shall be responsible to the insured for any return premium.

Since Rogge was a General Agent for Millers and Equity Mutual, these carriers were responsible for the integrity of .the Rogge Agency PFTA.

32.  Equity Mutual was supplied with a copy of the Rogge Agency monthly PFTA bank account statement, annual audit and all other pertinent financial documentation.  Millers was supplied with the annual audit of the Rogge Agency and monthly statements as requested. Consequently, it is impossible for these companies to not have been aware of the PFTA deficiency.  They were willing to allow Rogge to continue conducting business as their General Agent because of the production figures Rogge was responsible for generating.

33.  Millers and Equity were aware that Rogge used customer and carrier funds that was held in trust in order to cover for his brokerage offices in Gary and Michigan City, Indiana, as well as to expand the Classic Auto Insurance Program.  Both Millers and Equity knew that Rogge was guilty  of committing a long pattern of abusing the PFTA.

34.  Millers and Equity allowed Rogge to act with malice and with intent to defraud Belk and to have Belk prosecuted for a crime that Rogge had, in fact, committed.  The insurance carriers allowed Rogge to falsely accuse Belk so as to conceal Rogge's fraudulent and criminal actions.

35.  By allowing Rogge to file a complaint with the federal authorities against Belk, Millers and Equity were complicit in the fraud on Belk.  The Insurance Code states that no officer, director, agent, or employee of any company who makes or causes to be made any false entry in any company book, report or statement with intent to

-10-

injure or defraud the company, or any other company or person, or

to deceive any company officer, or the Director [of Insurance] or

any agent or examiner appointed to examine the company's affairs,

is guilty of a Class 4 felony.  Both Millers and Equity had a duty

to report Rogge to the Indiana State Insurance Director for misappro-

priation of monies from the PFTA.

COUNT I

COMMON LAW FRAUD/FRAUDULENT MISREPRESENTATION

36.  Plaintiff Belk incorporates paragraphs 1 through 35 as if

fully stated herein.

37.  Based upon information supplied to the government by Rogge

Belk was indicted in the United States District Court for the Northern

District of Indiana on June 19, 2003, on eight counts of mail fraud

alleging that Belk used his employer's [George C. Rogge Agency, Inc.]

checks to pay his personal credit card bill with MBNA.  Count 9 of the

indictment, bank fraud, was unrelated to the Rogge Agency but came

up during the government's investigation.

38.  A jury trial was held from June 21, 2004 through June 24,

2004.  Although Mr. Rogge testified, Belk's attorney did not question

Rogge about the PFTA.  On June 24, 2004, the jury returned guilty

verdicts on the 8 counts of mail fraud and acquitted Belk on the

remaining bank fraud charge.  The bank fraud charge was the only

count Rogge did not testify about.

39.  Rogge misrepresented to the jury that Belk did not have

a bonus arrangement for the payouts Belk received.

40.   In reliance on Rogge's perjured testimony, the jury convicted Belk on eight counts of mail fraud.  Thereafter, Rogge falsely and knowlingly told the presentence officer and the govern-ment representatives that the amount Belk should be resonsible for was $668,000.  Rogge did not tell the government, the jury, nor the probation department that Rogge had misappropriated hundreds of thousands of dollars from his Agency's PFTA.

41.   As a direct result of the misrepresentation and untrue statements made by Rogge, Belk was unjustly convicted of mail fraud and has suffered damages of not less than$1,413,512.65.


COUNT II
CONSPIRACY TO COMMIT FRAUD/FRAUDULENT MISREPRESENTATION

42.   Plaintiff incorporates paragraphs 1 through 41 as if fully stated herein.

43.   Based upon information supplied to the government by George Rogge, Belk was indicted in the United States District Court for the Northern District of Indiana on June 19, 2003, on eight counts of mail fraud alleging that Belk used his employer's [Rogge Agency] checks to pay his personal credit card bill with MBNA,  The checks were written from February 2000 through August 2002, and totaled $60,600. Count 9 of the indictment, bank fraud, was unrelated to the Rogge Agency but came up during the government's investigation.

44.   During Belk's three day jury trial, Rogge testified; however, Belk's attorney did not question Rogge about the PFTA issue, nor did counsel call a representative of either Millers or Equity Mutual to question them about the PFTA issue since they received constant

reports including bank statements and audits of the Rogge Agency.

45.    Rogge misrepresented to the government and the jury that Belk did not have a bonus arrangement for the payments Belk was alleged to have converted.  Millers and Equity Mutual also did not approach the government concerning their findings of irregularities in the PFTA.  Rogge had total control of the PFTA account and the insurance carriers had complete knowledge of the account's deficits. Each of Belk's bonus payments came from the Rogge Agency operating account and not the Premium Fund Trust Account.

46.    In reliance on Rogge's perjured testimony, the jury convicted Belk on eight counts of mail fraud.  Thereafter, Rogge falsely and knowingly told the presentence officer and representatives of the United States Attorney's office that Belk should be held responsible for a total loss of $678, 306.75.  In fact, Belk's total compensation for the years at Rogge was $201,000, which he agreed to pay back to Rogge rather than contest.  Belk paid a total of $174,000 of this amount and was to pay the remaining $27,000 when Rogge realized that he still needed over $477,000 to cover the whole Rogge had created in the PFTA. When Belk refused to cover Rogge's remaining debt, Rogge went to the government in hopes of extorting the needed funds from Belk.  Rogge did not tell the presentence officer, the government agents or Assistant United States Attorney that he had misappropriated over $678,000 from his Agency's PFTA.

47.    Rogge acted with the knowledge of both Millers and Equity Mutual.

48.    Rogge made these false statements to FBI Agents, the jury,

and the presentence officer knowing that Belk had not embezzled funds
George C. Rogge Agency, Inc.

49.  Rogge made these false statements in order to conceal his
own looting of the Agency's PFTA.

50.  Millers and Equity Mutual willfully and purposefully allowed
Rogge to conceal his criminal use of the PFTA and in so doing acquiesced
to Rogge's false accusations against Belk.

51.  As a direct result of the misrepresentation and untrue
statements of Rogge together with the support of co-conspirators,
Millers and Equity Mutual, Belk was unjustly convicted of mail fraud
and has suffered damages of not less than $1,413,512.65.

COUNT III

CONSTRUCTIVE TRUST AGAINST
GEORGE A. ROGGE, GEORGE C. ROGGE AGENCY, INC.
MILLERS GROUP OF COMPANIES, EQUITY MUTUAL INSURANCE CO.

52.  Plaintiff incorporates paragraphs 1 through 51 as if fully
stated herein.

53.  In 2002, Rogge asked Belk to repay the bonuses that he
had received from the Agency.  In return, Rogge promised not to make
allegations of fraud against Belk, allegations that Rogge knew were
false in the first place.

54.  Thereafter, Belk paid Rogge $174,000 of the $201,000 agreed
upon by the parties.

55.  When Rogge realized that he, George Rogge, had stolen over
$678,000 from the Agency PFTA, Rogge became aware that he had not
extorted enough money from Belk.

56. Once Belk refused to pay Rogge anything more than the agreed upon $201,000, Rogge turned in a complaint against Belk to the FBI and United States Attorney.

57. Rogge knowingly misrepresented to the government that Belk had embezzled money from the Rogge Agency.

58. Millers and Equity Mutual had documentation showing that the Rogge Agency PFTA was in deficit and did nothing to rectify the shortage nor did they challenge Rogge's assertions that Belk had embezzled funds from the Agency.

59. Rogge did not intend to keep his agreement with Belk.

60. Rogge willfully and purposefully made misrepresentations to Belk in order to dupe Belk into providing Rogge with substantial sums of money to cover Rogge's looting of the Agency's PFTA.

61. In reliance on Rogge's misrepresentations and untrue statements, Belk provided the Rogge Agency with $174,000.

62. Based on the Indiana insurance code, deficits in an Agency or Broker's PFTA must be paid by the insurance carriers. Millers and Equity Mutual knew that if Belk did not cover Rogge's PFTA deficit they would be required to do so.

63. As a direct result of Rogge's misrepresentations and untrue statements, Belk has suffered damages of not less than $174,000 and possibly as high as $1,413,512.65 (see attached itemization of Belk's losses).

64. Rogge used the $174,000 that Belk paid him to cover a portion of the Rogge Agency PFTA deficit that had been caused by the looting of George A. Rogge.

65. As a result of Rogge's wrongful actions, the Rogge Agency, Millers Group and Equity Mutual were wrongful beneficiaries of at least $174,000 of Belk's funds.

66. The Rogge Agency had no right to retain Belk's funds.

66. It would be unjust to allow Rogge, the Rogge Agency, and the insurance carriers to retain said funds as they conveyed no reciprocal benefit upon Belk.

WHEREFORE, the Plaintiff, Joshua Belk, prays for the following relief:

(a) That Defendants George A. Rogge, the George C. Rogge Agency, Inc., Larry Olin, Millers Mutual Group of Insurance Cos., and Equuity Mutual Insurance Co., be ordered to account to the Plaintiff for any and all financial compensation received from Belk;

(b) That this Honorable Court find and decree that all proceeds and profits received by the Defendants as herein alleged be held in a constructive trust for the benefit of the Plaintiff, and that the Court order that all proceeds and profits be transferred and conveyed to the Plaintiff, or in the alternative, that a constructive trust be placed on a minimum of $174,000 now held by the Defendants; and

(c) That this Honorable Court award such further relief as equity and justice may require. Belk attaches a listing of actual damages suffered by him to this complaint.

COUNT IV

VIOLATIONS OF RICO
GEORGE C. ROGGE AGENCY, INC., GEORGE A. ROGGE
LARRY OLIN, MILLERS MUTUAL  AND EQUITY MUTUAL

67.  Plaintiff restates paragraphs 1 through 66 as though fully stated herein.

DEFENDANTS" ACTIONS VIOLATE UNITED STATES STATUTES

ENACTED TO PROHIBIT RACKETEERING ACTIVITIES

68.  The actions by Defendants George C. Rogge Agency, George A. Rogge, and Larry Olin, Millers Mutual, and Equity Mutual violate United States Statutes enacted to prohibit racketeering activities including their fraudulent schemes detailed above.

67.  George C. Rogge Agency, Inc., George A. Rogge, Larry Olin, Millers Mutual Group of Insurance Companies, and Equity Mutual Insurance Company each committed two or more acts of racketeering in a ten year period, as stated in the following:

(i)  Scheme 1:  George C. Rogge Agency, Inc., George A. Rogge, and Larry Olin committed the following act(s) and to conceal their fraudulent activity alleged that Joshua Belk embezzled money from the Defendants. When a customer submitted a Classic Auto Insurance payment to an Olin owned agency by check or cash, Olin would either keep the funds or deposit said funds in his own bank accounts.  Customer checks made payable to Classic Auto usually were submitted to the Rogge Agency. Olin would then submit a check from his personal or operating account in a lump-sum total for the combined receipts.  This check from Olin was usually made out to Classic Auto.  A Rogge employee would enter the transaction into the Rogge Agency's accounting systems and then deposit

-17-

the check into Rogge's PFTA at Bank One, formerly NBD.  Olin's checks consistently bounced for insufficient funds.  These checks resulted in a PFTA deficit.  This was standard procedure between Olin and the Rogge Agency. (see Exhibit i).  Both Millers Group and Equity Mutual received bank statements and audits of the Rogge PFTA.  They had exact knowledge of Olin's checks and the PFTA deficit when Rogge accused Belk of embezzlement in order to conceal the Rogge looting of the PFTA.

(ii)   Scheme 2:  Customers submitted a Classic Auto Payment to an Olin owned agency.  Olin embezzled the money and Rogge covered the proceeds when called by a customer worried about whether he or she had insurance coverage.  Rogge would then attempt recovery of the money by depositing Olin's commission checks into the Rogge operating account and crediting customers with these payments.  Since the checks should have been deposited to the Rogge PFTA, a further shortage was created by Rogge depositing into the operating account.  Any excess commissions were credited to the Olin commission account.  (see Exhibit ii). Both Millers Group and Equity Mutual received bank statements and audits of the Rogge PFTA.  They had exact knowledge of Olin's checks and the PFTA deficit when Rogge accused Belk of embezzlement in order to conceal the Rogge looting of the PFTA.

(iii)  Scheme 3:  Rogge began seizing commission checks due Olin and for insurance written on companies that were not in the Classic Auto Insurance Program.  Rogge deposited these checks into the Rogge Agency operating account.  Cash payments from the non-Classic payments made at the Rogge Agency were used to match up against the

missing Classic Auto payments from Olin.  Although the deposit
balance would match with funds that were to be deposited to the PFTA,
the actual use of funds differed from that intended by the customer.
The importance of this scheme is that Rogge claimed Belk used a
similar manuever to embezzle funds from the Rogge Agency.  In fact,
Rogge instituted the scheme in an attempt to conceal the loss resultant
from the Olin embezzlement. (see  Exhibit iii).

(iv)  Scheme 4:  Rogge would attempt to offset Olin's insufficient
funds checks with commission checks due Olin.  However, rather than
depositing these commission checks into the Rogge Agency PFTA.  Rogge
used the commission checks as operating funds.  Eventually, some of
the commission checks were used by Rogge to operate the Olin agencies.
This resulted in a further PFTA deficit.  Both Millers Group and
Equity Mutual had documentation showing the scheme and refused to
turn the information over to the Indiana Department of Insurance
and actively participated in Rogge scheme to conceal the PFTA deficits
by claiming Belk embezzled the funds.  (See Exhibit iv).

(v)  Scheme 5:  Rogge took Olin's commission checks from non-
Classic Auto Insurance program companies and deposited these commission
checks into the Rogge Agency operating account.  From time-to-time,
Rogge would also deposit Rogge customer payments directly inot the Rogge
Agency operating account.  Depositing customer funds for premium payments
into any account other than a PFTA is a violation of Indiana Insurance
laws and federal fiduciary obligations under 18 U.S.C. §1346.  Although
Rogge's deposits would reconcile in the internal software accounting
system, the actual deposit would differ from the deposit slip sent to

the bank.  These deposits should have been deposited to the PFTA
in order to decrease the deficit.  Millers Group and Equity Mutual
had monthly documentation as in the case of Millers and periodic
accounting statements prepared for Equity Mutual so that both firms
knew about the scheme and Rogge's intent to cast  Belk as an embezzler
in order to conceal Rogge's looting of the PFTA.  (See Exhibit v).

(vi)  Scheme 6:  Rugge deposited Olin commission checks into the
Rogge operating account to be applied to past Olin NSF checks, rather
than depositing the commission checks into the PFTA to cover deficits.
(see Exhibit vi).

(vii)  Scheme 7:  Rogge accepted checks from the Christopher
Insurance Agency of Gary, Indiana that were consistently returned for
insufficient funds, and treated this violation of Indiana and federal
laws in the same manner as he did the Olin Agency.  Both Millers
Group and Equity Mutual were aware of this scheme and condoned it.
(see Exhibit vii).

68.  Rogge commited these crimes so that he could continue to
control the Classic Auto Insurance Prgram through the various insurance
carriers that the George C. Rogge Agency represented.  The concealment
of his PFTA looting enabled Rogge to retain his General Agency contracts
and the large overrides associated with these contracts.

69.  Plaintiff incorporates as if fully stated herein the conduct
described in Counts I through III.

70.  The previously stated conduct occurred within a ten year
period and is sufficiently related to constitute a pattern of racketerring

activity.   Specifically, all the acts involve fraud in banking and financial transactions related to insurance and the sale and under-writing of insurance products.   All such transactions affect interstate and foreign commerce.

71.   George A. Rogge is  the owner of the George C. Rogge Agency, Inc., an insurance agency and brokerage firm.

72.   George A. Rogge used the George C. Rogge Agency, Inc. as a criminal enterprise and engaged in a scheme to defraud the Plaintiff of more than $1,400,000 using financial institutions, the wires and mails.

73.   Millers and Equity Mutual joined Rogge in this scheme by periodically reviewing the Rogge company financial statements and auditing its books without once complaining to the Indiana Insurance Department or informing the government of Rogge's financial situation. Instead the government targeted Belk as both Millers Group and Equity Mutual allowed the prosecution of Belk.

74.   At all times relevant to this complaint George C. Rogge Agency, Inc. was in the busines of insurance sales and underwriting representing  several insurance companies.

75.   At all times relevant to this complaint, the George Rogge Agency, Inc. maintained an ongoing structure with offices and staff performing various functions and duties regarding the business of insurance sales and underwriting.

76.   Belk was employed by the George C. Rogge Agency, Inc. as its Chief Financial Officer during all times relevant to this complaint.

77.   The fraudulent actions of Rogge, the Rogge Agency, Olin, the Millers Group and Equity Mutual concern the property of Belk as described in detail above.

78.   These fraudulent actions of Rogge, the Rogge Agency, Olin, Millers and Equity Mutual violate the following United States Statutes:

(i)   Defendants George A. Rogge, the George C. Rogge Agency, Inc., Larry Olin, Millers Group of Insurance Companies, and Equity Mutual Insurance Company's actions as detailed in the foregoing, violate United States statute 18 U.S.C. §1962(a);

(ii)   Defendants George A. Rogge, the George C. Rogge Agency, Inc., Millers Group of Insurance Companies and Equity Mutual Insurance Company's actions as detailed in the foregoing, violate United States statute 18 U.S.C. §1962(b);

(iii)   Defendants George A. Rogge, the George C. Rogge Agency, Inc., Larry Olin, Millers Group of Insurance Companies and Equity Mutual Insurance Company committed actions as detailed in the foregoing that violate 18 U.S.C. §1962(c);

(iv)   Defendants George A. Rogge, the George C. Rogge Agency, Inc., and Larry Olin committed acts as detailed in the foregoing that violate 18 U.S.C. §1962(d).

78.   As a direct and proximate result of the actions of, and conspiracy among the George C. Rogge Agency, Inc., George A. Rogge, Larry Olin, Millers Group of Insurance Companies, and Equity Mutual Insurance Group, the Plaintiff Joshua Belk, suffered losses of $1,413,512.64.

WHEREFORE, Plaintiff JOSHUA BELK prays for judgment against Defendants GEORGE C. ROGGE AGENCY, INC., GEORGE A. ROGGE, LARRY OLIN, MILLERS GROUP OF COMPANIES and EQUITY MUTUAL INSURANCE COMPANY in the amount of $1,413,512.65 plus treble damages, attorneys' fees and costs of this suit.

Respectfully submitted,

JOSHUA BELK
Plaintiff Pro Se
Reg. No. 07632-027
Federal Prison Camp
P.O. Box 1085
Oxford, Wisconsin 53952

CERTIFICATE OF SERVICE

I, Joshua Belk swear, under penalty of perjury, that I mailed the foregoing Complaint to those in the Service List below by depositing each in the United States Mailbox at the Federal Prison Camp, Oxford, Wisconsin, first class postage prepaid, on April 25, 2007, prior to 11:00 p.m.

SERVICE LIST:

MILLERS GROUP OF INSURANCE COMPANIES
Attn: General Counsel
805 North Front Street
Harrisburg, Pennsylvania 17108-1246

EQUITY MUTUAL INSURANCE COMPANY
125 East Walnut Street
Des Moines, Iowa 50306-9344
Attn: General Counsel

GEORGE C. ROGGE AGENCY, INC.
c/o Attorney Gregory S. Reising
The Law Office of Gregory S. Reising
607 South Lake Street, Suite A
Gary, Indiana 46403

GEORGE A. ROGGE
c/o Attorney Gregory S. Reising
The Law Office of Gregory S. Reising
607 South Lake Street, Suite A
Gary, Indiana 46403

LARRY OLIN, aka LAWRENCE OLIN
1711 West Ridge Road
Gary, Indiana 46408

CLERK'S OFFICE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
South Bend Division
401 South Michigan Street
South Bend, Indiana 46634-7003

Respectfully,

Joshua Belk

